**BAY CITY FEDERAL SAVINGS AND LOAN ASSOCIATION et al.,**
Appellants,

v.

**W. Sale LEWIS, Savings and Loan Commissioner of Texas, et al., Appellees.**

No. 11797.

Court of Civil Appeals of Texas,
Austin.

Jan. 27, 1971.

Rehearing Denied Feb. 17, 1971.

Jacobsen & Long, Joe R. Long, Gary Evatt, Austin, C. R. Bell, Bay City, Duckett & Duckett, L. L. Duckett, El Campo, for appellants.

Crawford C. Martin, Atty. Gen., Nola White, First Asst. Atty. Gen., Alfred Walker, Executive Asst. Atty. Gen., Phillip G. Warner, Asst. Atty. Gen., Austin, Heath, Davis & McCalla, Dudley D. McCalla, Austin, for appellees.

SHANNON, Justice.

Bay City Federal Savings and Loan Association and Wharton County Savings and Loan Association have appealed from a judgment of the 167th District Court of Travis County sustaining the order of the Savings and Loan Commissioner of Texas, granting a charter for Matagorda County Savings and Loan Association to be located in Bay City.

We affirm the judgment of the trial court.

Appellants' brief contains five points of error, the first being procedural and those remaining inquiring whether or not the

Commissioner's order is supported by substantial evidence.

▓ Appellants complain by their first point that the form of the Commissioner's order renders it invalid. Specifically, their complaint is that the Commissioner failed to set out the underlying facts supporting his finding that the prerequisites set out in Sections 2.02, 2.03, 2.04, 2.05 and 2.06 of the Act [1] had been complied with, and appellants maintain that by virtue of Sec. 11.11 (4) [2] of the Act such omission vitiates the entire order. Among other things, Section 2.02 prescribes the range of the par value of shares of permanent reserve fund stock issued by an association and the minimum amount of permanent reserve fund stock which must be issued and outstanding. Section 2.03 requires that the amount of permanent reserve fund stock required by the Commissioner, within the range established by Section 2.02, be subscribed to and paid for in cash as a prerequisite to approving a charter. Section 2.04 permits the Commissioner to require an applicant for a new charter to pay in capitalization, additional to the amounts paid in for permanent reserve fund stock, in the form of paid-in surplus. Sections 2.05 and 2.06 relate to mutual associations and are not applicable inasmuch as the proposed association is a permanent reserve fund stock association.

The finding under attack was made by the Commissioner in basically the statutory language of Subsection (1) Section 2.08 of the Act.[3,4]

This is the second case in which this Court has recently considered the effect of the omission by the Commissioner to set out underlying facts supporting a required finding. In Gonzales County Savings and Loan Association et al. v. Lewis et al., Tex.Civ.App., 461 S.W.2d 215 (1970), this Court held such omission was error requiring reversal. Subsections (a), (b), (c) and (g) of Sec. 2.4 of the Rules and Regulations for Savings and Loan Associations [5] and Sec. 2.08(2) of the Act were at issue in that case. In *Gonzales* the findings of the Commissioner, made pursuant to these subsections of the Rules and this section of the Act, were contested *on the merits* in the administrative hearing, the trial court, and in this Court.

In the present case, unlike *Gonzales*, the Commissioner's finding that the prerequisites set out in Sections 2.02, 2.03, 2.04, 2.05 and 2.06 had been met, were never seriously at issue at the administrative level or in the trial court. Appellants did allege in the trial court that the Commissioner's finding that the prerequisites set out by the above sections had been met, was not supported by substantial evidence, but the trial court ruled adversely to appellants, and by not assigning as error the trial court's holding, appellants abandoned that claim.

Appellants do not contend that they were harmed by the omission in the order. That

1. In this opinion the term "Act" refers to the Texas Savings and Loan Act, Art. 852a, Vernon's Tex.Civ.St.

2. "(4) A decision or order adverse to a party who has appeared and participated in a hearing shall be in writing and shall include findings of fact and conclusions of law, separately stated, on all issues material to the decision reached. Findings of fact, if set forth in statutory language, shall be accompanied by a concise and explicit statement of the underlying facts supporting the findings."

3. "(1) the prerequisites, where applicable, set forth in Sections 2.02, 2.03, 2.04, 2.05, and 2.06 have been complied with and

that the Articles of incorporation comply with all other provisions of this Act;"

4. The order of the Commissioner in this connection reads as follows: "* * * that the prerequisites as set forth in Sections 2.02, 2.03, 2.04, 2.05 and 2.06 of the Texas Savings and Loan Act have been complied with and that the Articles of Incorporation of the proposed association comply with all provisions of the Texas Savings and Loan Act."

5. In this opinion the terms "Rule" or "Rules" refer to the Rules and Regulations of the Savings and Loan Section of the Finance Commission.

the appellants were on notice of the basis of the Commissioner's order is evidenced by their brief and argument. This Court in reviewing the Commissioner's order is to determine whether or not *challenged* findings are supported by substantial evidence. Here this Court is not called upon to examine the substantial evidence questions with respect to Sections 2.02, 2.03, 2.04, 2.05 and 2.06 of the Act since appellants abandoned this position, and, since these findings were not really in issue below. We feel that neither appellants nor this Court would benefit by remanding this case to the Commissioner with instructions to set out the underlying facts supporting a finding which in fact is not contested.

We hold that the omission by the Commissioner to detail underlying facts supporting a finding which is not, in fact, in issue is not error of the character requiring reversal. Appellants' point of error number one is overruled.

Appellants' points of error two through five raise substantial evidence questions. These points assert that the Commissioner's findings of public need, of volume of business sufficient to indicate a profitable operation, and of absence of undue harm to existing associations, are not reasonably supported by substantial evidence. These findings, among others, are required by Sec. 2.08 of the Act as a condition precedent to the issuance of a charter to a proposed association.

■ A governing principle in reviewing the Commissioner's order is that if there be substantial evidence in the record supporting the findings, then the order must stand, even though the Commissioner may have decided differently from what the reviewing court might have decided. Gerst v. Goldsbury, 434 S.W.2d 665 (Tex.Sup. 1968).

■ For substantial evidence review purposes a summary of evidence supporting the Commissioner's order follows. Matagorda County, in general, is the community to be served by the proposed association. Matagorda is one of the tier of twelve counties fronting the Gulf of Mexico. Bay City, the county seat, is also the principal center of economic activity in the area. Historically, rice farming and ranching have been the paramount economic pursuits in the county but within recent years mineral exploitation and manufacturing have also become of major importance.

Matagorda County's population in 1967 was approximately 32,635 while that of Bay City in 1968 was about 17,000. The county has grown in recent years and has experienced a higher percentage of population growth than that of the State as a whole. From 1960 to 1968 the average annual percentage increase for the State was 1.7% while that of Matagorda County was 2.6%. The county population, while increasing, has also had an increase in the "effective buying income per household." In 1957 that income per household was $4,911.00 while in 1967 that figure had enlarged to $7,202.00.

The commercial and industrial activity of the area under consideration is centered in and near Bay City. The most important recent industry is the Celanese plant located adjacent to Bay City. Celanese has a payroll of about 500 employees at high wages totaling about $5,000,000 annually. Since the installation of the plant, it has been enlarged and diversified almost continuously. The Celanese operation, it seems is a "basic" industry i. e. one which attracts other service type industries and businesses to accommodate the additional people brought into the area by the "basic" industry. In this connection, in 1964 The Big Three Industrial and Gas Equipment Company built a plant costing $1,000,000 to supply Celanese with oxygen and nitrogen. In 1966 Coastal States Gas Producing Company constructed a $6,000,000 plant in the county. Another recent industrial development is the construction of a $1,500,000 rice drying plant. Other local industries include oyster shell production, concrete products, cotton ginning, meat and seafood packing and feed grinding and processing.

Other factors demonstrate the growth of the county's economy. Retail sales increased from about $30,000,000 in 1960 to over $43,600,000 in 1967. Postal receipts increased from $158,910 in 1960 to $262,366 in 1968. Electrical connections, water connections and telephones in service have all increased over the past few years, as have property valuations. Total employment in the county has increased from 7,355 in 1960 to 9,060 in 1968.

Matagorda County and Bay City, it seems, have the conditions both favorable and necessary for continued growth. The county has ample natural resources and fresh water, adequate transportation facilities, and an attractive environment. The evidence is that beach resort communities will more than likely appear in the future taking advantage of fine beaches, surf, and sports fishing. Dr. Francis Yeager, appellants' economic expert, predicted that additional petro-chemical and related industries will locate in the Bay City area in the coming years.

There are three banks in the county, two in Bay City and one in Palacios. All three banks enjoyed large increases in deposits from 1960 to 1968. The deposits in The First National Bank of Bay City increased from $13,404,000 to $25,414,000, while the deposits in the Bay City Bank and Trust Company increased from $9,440,000 to $15,-557,000. The City State Bank of Palacios increased its deposits from $2,785,000 to $4,858,000. The chairman of the board of The First National Bank of Bay City testified in effect that his bank in the period from 1960 to 1968 had earned well over $1,000,000, and though opposing the new association, he admitted that his bank would remain solvent and profitable if the proposed association went into business as would Bay City Bank and Trust.

The county has one savings and loan association, Bay City Federal located in Bay City and has an agency office in Bay City of Wharton County Savings and Loan Association. Like the banks in the county, Bay City Federal experienced substantial deposit increases in the period from 1960 to 1968. The deposits in Bay City Federal enlarged from $6,035,000 to $17,638,000, or nearly $1,500,000 annually during the 1960's. In this connection Dr. John P. Owen, appellees' economic expert, estimated that approximately $5,000,000 in personal savings was available in the county for possible deposits in the available institutions in 1969. As might be expected, these years were profitable ones for Bay City Federal. From 1965 to 1968 Bay City Federal placed in its reserves and undivided profits accounts, out of earnings, more than $400,000.

Dr. Owen testified concerning the deed of trust recordations in Matagorda County from 1964 through 1968. This information is significant because it shows the market potential for mortgage loans on real property and hence provides a standard to determine whether the proposed association is needed and could find a profitable investment outlet for its accumulated shares. Dr. Owen's testimony indicated that overall lending activity within Matagorda County remained high while the percentage of the deed of trust recordings made by Bay City Federal declined. The dollar volume of deeds of trust filed in the county for those years between 1964 and 1968 was a little over $39,300,000 or an annual average of about $8,000,000. Bay City Federal's share of the market for the total loans declined steadily each year of the five year period falling from 28.0% in 1964 to 9.9% in 1968. If the mortgage loans are divided into two categories i. e. those below $40,000 and those above $40,000 a similar showing of decline occurs. For those loans below $40,000 Bay City Federal's share of the market decreased from 37.5% in 1964 to 18.3% in 1968. For loans above $40,000 Bay City Federal's share declined from 6.7% of the market in 1964 to 2.1% in 1968.

Bay City Federal together with all other outside savings and loan associations served as mortgagees for only 35.4% of the deed of trust loans filed over the 1964–68 period on the basis of dollar volume. Banks accounted for 28.4% of such loans,

individuals accounted for 17.2% and all others accounted for 19%. In this connection, Matagorda County banks underwrote nearly 2¼ times the volume of deed of trust loans as did outside banks in the 1964–1969 period, while Bay City Federal underwrote 1⅓ times the volume of the deed of trust loans as did outside savings and loan associations over the same period.

The information furnished by Dr. Owen demonstrated that Matagorda County home purchasers are dependent upon outside sources of funds or upon funds supplied by individuals, sources which may be unstable or unavailable if outside or other investments prove more attractive and the market for funds becomes sufficiently tight.

While there is some evidence to the contrary, we believe that there exists substantial evidence in the record to support the Commissioner's order, and accordingly, points two through five are overruled.

The judgment of the trial court is affirmed.